UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF WISCONSIN

---

*In re:*                                                                             Case Number: 22-10296-7

      KELLY LYNN PETERMAN,

              Debtor.

---

### **DECISION ON UNITED STATES TRUSTEE'S MOTION TO DISMISS CASE FOR ABUSE UNDER 11 U.S.C. § 707(b)(3)**

The United States Trustee ("U.S. Trustee") moves to dismiss Kelly Lynn Peterman's ("Debtor") Chapter 7 bankruptcy case under section 707(b)(3). The U.S. Trustee argues that the totality of the circumstances of the Debtor's financial situation shows abuse ("Motion"). The Debtor objects, arguing that his income is not excessive and his expenses are reasonable and necessary. The Court held an evidentiary hearing on the Motion on November 18. For the reasons stated below, the Court denies the Motion.

#### **FACTS**

The Debtor is a service writer for Kocourek Honda in Stevens Point, Wisconsin. He has earned about $90,000 per year in salary and commission. His pay consists of $22,000 in base salary and a unique commission structure based on the hours of automobile service that he writes for customers. On top of the base salary and commission, he receives a $350 bonus "spiff" if he bills 500 or more hours per month for three straight months.

The dealership was sold in August 2021. Before the sale, he provided photography services for the dealership. He took pictures of vehicles and posted them on the company's website. These services and the added compensation terminated when the dealership was sold.

In addition, Debtor makes money through a side business called Seasonal Solutions. This business provides lawnmower, snow blower, and dock cleaning and repair services. He reported $11,987 in income from Seasonal Solutions in 2021. Unfortunately, the Debtor does not have any documents or records for the business because the basement where the papers were kept flooded in January 2022. The Debtor did not conduct business for Seasonal Solutions this year because he tore his rotator cuff in March. He will not make any income through Seasonal Solutions until after surgery, which is scheduled for December.

In May 2020, the Debtor replaced the boat used in Seasonal Solutions with a 2020 Chaparral sport boat ("Boat") and trailer. This boat is larger and valued at around $67,335. It is used for Seasonal Solutions' dock cleaning and repair services. The Boat permits more efficient and easier transportation and storage of cleaning products, such as a portable pressure washer. It also provides a safer platform for the cleaning and repair services. Finally, it will enable him to add an additional person to join him in cleaning and repairs as the business increases. His payments for the Boat are about $685 per month.

Debtor supports a 16-year-old daughter who lives with him. He also helps support his 13-year-old son. His son splits time between the Debtor and

his ex-spouse. The son spends most weekends with the Debtor. He receives $754.74 per month in child support for his daughter. This will end around September 2024 when his daughter turns 18. He pays $86 per week in support for his son. And he has a son who is serving in the Army Reserves. This son does spend time in the Debtor's home.

*The Debtor's Statements, Schedules, and Means Test*

The Debtor's schedules suggest that his obligations are primarily consumer debts. He lists $101,933 in secured debt on Schedule D, $368.34 in priority, and $156,098.05 in unsecured, non-priority debt on Schedule E/F. Much of the Debtor's secured debt is $66,875 owed to Landmark Credit Union for the Boat.

The Debtor's Form 122A-1 states that there is no presumption of abuse because he is below the median household income for a household of three. In the six months before filing, the Debtor states an average gross monthly income of $6,430.67, plus $83.33 in income from Seasonal Solutions and $754.74 in child support, for a total of $7,268.74 per month. When multiplied by 12, this equals an annual gross income of $87,224.88, which is slightly less than the median income of $88,431 for a family of three living in Wisconsin.[1] The U.S. Trustee agrees the presumption does not apply.

But the U.S. Trustee insists that the income figure is still inaccurate, and that the Debtor's income is higher. As of September 30, 2022, the Debtor's

---

[1] The IRS Standard of the median household income for a family of three in Wisconsin was recently increased to $91,906 for cases filed on or after November 1, 2022.

3

year-to-date income was $77,899.41 according to his pay advices, which breaks down to roughly $8,439.11 per month. In turn, monthly income of that amount would equal a gross annual salary around $101,269.32. The Debtor also reported income of $91,900 in 2021 and $99,855 in 2020, which are both above the median. Moreover, the U.S. Trustee highlights that Debtor's 2021 tax returns entitled him to federal and state income tax refunds of $12,628 and $1,673, respectively, but that his budget does not include adjustments for tax overwithholding and the expected tax refund. Based on these adjusted calculations of the Debtor's income, the U.S. Trustee believes he has a monthly disposable income of at least $991.65.

The U.S. Trustee also argues that the Debtor should not be allowed to retain the Boat. The U.S. Trustee states that the Debtor used the Boat exclusively for leisure in 2022. The Debtor's schedules report net income from Seasonal Solutions of $342 per month. But the Debtor pays Landmark Credit Union $685.38 a month for the secured debt payments on the Boat. So, the Debtor's business operations are not enough to cover the costs of the Boat and other business expenses.

In response, the Debtor clarified that the U.S. Trustee's estimation of his annual income was too high. First, he is on a semi-monthly payroll schedule, not bi-weekly, which the U.S. Trustee used to calculate his income. In other words, he receives 24 paychecks per year, not 26. He also testified that his current income is artificially high based on a lack of employees at the dealership. He explained that the dealership has had trouble retaining

4

employees to write service contracts. For a period in the spring there was another employee. She worked for a couple of months and then quit. Debtor was once again the only service writer in April, May, and June. Another person was hired in July. She was there for two months and then she quit. Before quitting she took a two-week vacation in July—which is the dealership's busiest month of the year. As a result, he's been forced to work long, unsustainable hours. Because he was essentially the only person writing service orders, his commissions were higher than they will be if additional employees are hired. The Debtor expects the dealership will find a new employee soon which will reduce his commission and spiff bonuses.

He testified that he's expecting significant expenses soon. To start, he had surgery at the end of November to treat a hernia. A second surgery is scheduled in December to treat his rotator cuff. His current deductible is $4,000, and he expects his premium to increase after the surgeries and in the new insurance year. The Debtor also needs another inhaler, Flovent, as well as an albuterol inhaler, each of which have become significantly more expensive. The added cost is $593 per month for the Flovent inhaler (before his deductible is met), and $45 per month for the albuterol inhaler. He also takes an oral medicine with a monthly copay of $179. His doctor has further recommended that he will soon need bifocals, and his youngest son will need braces. A portion of the cost of the braces will be covered by his insurance and that of his ex-wife, but there is an uncovered cost of around $1,750 out-of-pocket.

The Debtor also testified that his oldest son will be starting college on a GI Bill. While the GI Bill should cover most of his expenses, he will be living with the Debtor until January 2023. This will increase household food expenses. This son will also spend time at home, thus increasing household expenses.

Moreover, the $754 per month that he receives in child support will end in less than two years when his daughter turns 18. At that point, not only will his household income decrease, but his expenses may increase since she plans to attend college and will still be a dependent.

The Debtor also explained that he's slowly recouping from several recent expenses. First, from complications in his divorce which occurred around 2020. He estimated that his attorney fees and costs to retain a guardian ad litem were around $12,000. Second, he stated that his 16-year-old daughter was involved in two car accidents this year. She was unharmed, but the damage associated with each accident totaled $3,500 and $6,500, respectively. Each of these expenses effectively increased his household expenses and any tax refund or employment income were justifiably consumed for these expenses.

The daughter's accidents will also likely increase automobile insurance costs. His transportation expenses have also increased with the increase in fuel costs. This relates to the additional weekly travel to visit and pick up his minor son for the time the son spends with him.

While the income from Seasonal Solutions has been minimal in 2022 because of his injuries, Debtor credibly testified he is trying to rebuild the business for the coming season. He has been in contact with existing customers and is trying to expand his customer base.

Even so, the U.S. Trustee asserts that the totality of the circumstances establishes abuse under the Code. The U.S. Trustee mainly focuses on the Debtor's retention of the Boat, arguing that it has not been used for business activity in 2022 and is an unnecessary luxury item. The Debtor's expenses could, according to the U.S. Trustee, be reduced without depriving him of necessities.

In the Trustee's Motion, and at the hearing, the U.S. Trustee asserts that if the Boat expenses are removed and the income adjusted to the U.S. Trustee's calculations, the Debtor could afford to pay $1,337 a month to his unsecured creditors. Over the life of a five-year plan, this amount would total $80,220, which represents more than 51% of the total unsecured debt or 78% of his dischargeable unsecured debt (not counting student loans). On top of his ability to fund a plan, the U.S. Trustee argues that the Debtor misrepresented his income on his Schedule I by understating his income and overestimating his tax withholding, and that he did not suffer any pre-filing calamity or sudden illness.

The Debtor points out this ignores the damage to the Debtor's rotator cuff and its impact on income from Seasonal Solutions. It also ignores the reduction in income following the August 2021 sale of the dealership. That sale

7

reduced commission rates, eliminated the added income from photography, and does not consider the likely reduction in commissions from the employment of another employee.

## DISCUSSION

The U.S. Trustee states that the Motion is limited to 11 U.S.C. § 707(b)(3). It does not assert that 11 U.S.C. § 707(b)(2) forms a basis for the Motion. In cases under section 707(b)(3), the U.S. Trustee, not the debtor, bears the burden of proof by a preponderance of the evidence. *In re Rowell*, 536 B.R. 245, 251 (Bankr. E.D. Wis. 2015) (citing *Ross-Tousey v. Neary (In re Ross-Tousey)*, 549 F.3d 1148, 1161–62 (7th Cir. 2008)).

### A. <u>Jurisdiction</u>

This Court has jurisdiction under 28 U.S.C. §§ 1334 and 157(a). Venue is proper in this Court as provided in 28 U.S.C. § 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (J). The Court may enter final judgment. 28 U.S.C. § 157(b)(1).

### B. <u>Abuse Warranting Dismissal Under Section 707(b)(3)</u>

Section 707(b)(3) of the Code allows the court to dismiss a case when "the debtor filed the petition in bad faith; or the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." In *In re Kruse*, 545 B.R. 581 (Bankr. W.D. Wis. 2016), this Court stated that, in analyzing the totality of a debtor's circumstances,

> The most relevant factor is the debtor's ability to pay, but the court must also consider

> (1) whether the bankruptcy petition was filed because of sudden illness, calamity, disability or unemployment; (2) whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to pay; (3) whether the debtor's proposed family budget is excessive or unreasonable; and (4) whether the debtor's schedules and statements of current income and expenses reasonably and accurately reflect the true financial condition.
>
> An important consideration is whether debtors have enough income to "repay a substantial portion of their debt." A court can find abuse when there is evidence "that the Debtor has manipulated the means test, purchased luxuries on credit on the eve of bankruptcy, altered his expenses in his Schedules, accrued significant debt prior to the petition, or that his budget is excessive or unreasonable." Other relevant factors include whether expenses can be reduced significantly without depriving debtors of necessities or whether debtors have a stable source of income. These determinations are made on a case-by-case basis, and require a more subjective, holistic approach.

*Kruse*, 545 B.R. at 589 (citing *In re Lorenca*, 422 B.R. 665, 668–70 (Bankr. N.D. Ill. 2010)).

In *Lorenca*, the Northern Illinois Bankruptcy Court discussed the interplay of subsections 707(b)(2) and (b)(3) regarding a debtor's income. The court noted that a debtor's ability to pay is the focus in the subsection (b)(2) means test, and since it is also a consideration under the totality of the circumstances analysis of subsection (b)(3), courts have struggled to identify the boundary lines. The court cited an earlier case which reasons that "[w]hen addressing ability to pay under section 707(b)(3), a court must therefore be attentive to the policy choices made by Congress in drafting the means test, including the fact that it gave preferred treatment to secured creditors by allowing scheduled payments of secured debt to be listed as deductions without limitation." *Lorenca*, 422 B.R. at 669 (citing *In re Le Roy*, 2009 Bankr.

9

LEXIS 899, 2009 WL 357923, at *3 (Bankr. E.D. Wisc. Feb. 12, 2009)). Thus, the court continued,

> [A] court should not dismiss a case for abuse under Section 707(b)(3) solely because a debtor has a high amount of secured debt or solely because a debtor intends to reaffirm secured debt. However, this fact, when combined with other elements . . . or when combined with evidence that the Debtor was attempting to manipulate the means test, could still demonstrate abuse. [*In re Nockerts*, 357 B.R. 497, 507–08 (Bankr. E.D. Wisc. 2006)]. Therefore, while a desire to reaffirm secured debt is not in itself abuse, a court can find abuse under the totality of circumstances when there is "evidence that the Debtor has manipulated the means test, purchased luxuries on credit on the eve of bankruptcy, altered his expenses in his Schedules, accrued significant debt prior to the petition, or that his budget is excessive or unreasonable."

*Lorenca*, 422 B.R. at 670 (citing *In re Le Roy*, 2009 Bankr. LEXIS 899, 2009 WL 357934, at *4).

Indeed, no single factor in a totality of the circumstances analysis controls whether a filing is abusive. This Court in *In re Roll*, 400 B.R. 674 (Bankr. W.D. Wis. 2008), explained that if a debtor does not have an ability to pay, the presumption under 707(b)(2) does not arise, and the court may consider bad faith or the totality of the circumstances. But after finding an inability to pay in the first step, this Court reasoned that "it does not make sense to use an unspecified, court-crafted formula to conclude that, the debtor does have an ability to pay, and that the case should therefore be dismissed under the totality of the circumstances approach." *Roll*, 400 B.R. at 679. Together, *Lorenca* and *Roll* stand for the idea that neither substantial secured debts, nor an ability to pay, *alone*, can be used to find abuse under section 707(b)(3).

10

*Kruse* reflects a holistic approach in analyzing the totality of the circumstances, which involves more than just looking at secured debts or a debtor's ability to pay. This case, like *Kruse*, confirms that facts matter.

*Kruse* involved debtors who filed a voluntary Chapter 13 petition in November 2014. After converting to a Chapter 11, their schedules listed a house in Cumberland, Wisconsin, and disclosed monthly income of $10,318.28 and expenses of $7,339.87, leaving $2,978.41 in net monthly income. Shortly after filing their schedules, the debtors filed a Statement of Current Monthly Income that listed monthly income of $16,264.55. The U.S. Trustee moved to dismiss or convert the case, arguing that there was excessive spending on dining, entertainment, gifts, clothes, travel, horses, and other consumer goods, leaving nothing for creditors. The case was converted to a Chapter 7.

But then (after some delay computing back taxes because of a computer failure), the debtors calculated that they owed delinquent taxes of around $137,000. Further, after the conversion it was revealed that the debtors did not live in their Cumberland, Wisconsin, house and that the lender on the property agreed to waive the deficiency as part of a foreclosure action. As a result, the U.S. Trustee moved to dismiss the case under section 707(b)(2) and for abuse under section 707(b)(3). The Trustee alleged that the debtors did not accurately schedule their retirement contributions, engaged in excessive consumer spending, did not suffer any pre-filing calamity, and had the ability to repay their creditors.

In granting the U.S. Trustee's motion to dismiss, this Court was careful to identify several egregious markers of abuse. For instance, the Kruses listed monthly household expenses of $8,869, and $9,109.08 in monthly debt payments. "Assuming the schedules, the operating reports, and the Statement of Current Monthly Income—all signed under penalty of perjury—were accurate, there [was] an almost threefold increase in expenses in less than a year," which this Court found "overstated and doubtful." *Kruse*, 545 B.R. at 590–91. The debt payments listed included roughly $4,200 in payments on the Cumberland house (which, again, debtors did not live in or intend to keep), four vehicles (one of which had been repossessed), a horse trailer, and duplicate entries for tax arrearage payments.

The debtors also contributed $1,075 per month to a retirement fund according to Schedule I, but this figure didn't match the corresponding entry on Schedule B. The debtors explained that this was only a preliminary amount because they weren't sure if they were actually going to set up the accounts (they did not), but they never amended their schedules to resolve this discrepancy. And there was no evidence of a pre-filing calamity or illness which forced the debtors into bankruptcy. This Court noted that the most relevant factor was the Kruses' ability to pay. It also found they had substantial monthly income, and the many discrepancies between their schedules and means test, repeated omissions and failures to amend, and enormous personal expenses warranted dismissal.

The facts in *Kruse* are distinguishable from this case. To start, the debtors in *Kruse* failed the means test and did not rebut the presumption of abuse. The decision first recognized the split of authority of whether section 707(b) applies to converted cases. This Court held that it did apply. Then the Court determined that the debtors' income exceeded their expenses and that there was a presumption of abuse. The debtors did not present evidence to rebut the presumption, and the case could have been dismissed on that ground alone. That said, on the bases presented and arguments, the Court then ruled that, even without a presumption of abuse under 707(b)(2), the case could still be dismissed based on the totality of circumstances under section 707(b)(3).

Here, the only secured debt that the U.S. Trustee has identified as an unnecessary luxury item is the Boat. The Debtor testified that he needs the Boat to assist with dock cleaning and repair for his side business, Seasonal Solutions. The U.S. Trustee did not dispute a boat had been used in this business but only that it was not used for the business in 2022. It argues the Boat is larger, expensive, and was used once or twice in 2022 for personal purposes and not business.

Debtor uses the Boat to transport tools (such as portable pressure washers) and cleaning supplies. He credibly testified that trying to clean and repair docks without the Boat would be difficult and dangerous. The Boat affords Debtor the ability to more easily and safely perform cleaning and repairs. And while it's true that the Debtor pays $685 per month to keep the

13

Boat (which includes winter storage), and that his expenses in maintaining the Boat and purchasing cleaning supplies may exceed the business's income in certain months, he obtained a tax deduction resulting from depreciation in 2021. He can also claim certain deductions going forward. Further, before his injury he was growing his business and is renewing efforts to revive and grow the business after repair of his rotator cuff.

It is also unclear whether selling the Boat would yield more disposable income for a Chapter 13 plan. It's uncertain how much the Debtor could sell a two-year-old used boat for, and if it sells for less than the amount needed to satisfy Landmark Credit Union's lien, then Landmark would have a deficiency claim that would dilute the pro rata share of other unsecured creditors in a plan. It would also eliminate any potential income from the operation of Seasonal Solutions.

The Debtor's current and anticipated income paints an even murkier picture. The U.S. Trustee argues that his income is higher than reported, but on the date of filing he had a stated income of $87,224, and the applicable median was $88,431, which passes the means test. The gist of the U.S. Trustee's argument on this point is that Debtor is somehow understating his income. But he testified that his 2021 income and year-to-date income is artificially high because he's overworked, and that the dealership is hiring a new employee (which may have already occurred at the time of this decision). This will reduce his income. The Court finds the Debtor's testimony credible,

and it appears to be more than mere speculation that a new service writer will reduce the Debtor's anticipated commissions.

Additionally, if the Debtor was in a hypothetical Chapter 13 case, his current disposable income would be almost completely addressed by *Lanning* adjustments. Counsel for the U.S. Trustee argues in her conclusions of law that "[b]ased on [Debtor's] net income of $6,164.65 a month, the Debtor has disposable income of at least $991.65." ECF No. 33, ¶ 17. At the hearing, counsel for the U.S. Trustee and the Court reasoned that there may only be roughly $700 per month in disposable income. Indeed, the Debtor stated that he'll be undergoing two surgeries before the end of the year, his medical expenses (including two inhalers) have sharply risen due to inflation, his doctor recommends that he'll need bifocals soon, and his youngest son needs braces. His oldest son will also be living with him until he begins college, and his daughter will begin college in less than two years, at which point his $700 monthly child support income will cease.

Lastly, the U.S. Trustee mentions in the Motion that no pre-filing calamity or sudden illness prompted the bankruptcy filing. In response, the Debtor testified that his divorce expenses and the ownership takeover of the dealership factored into his decision to file bankruptcy. His daughter also had two accidents. These events were sudden and unanticipated as was the later rotator cuff injury. These events took place several months before or shortly after the filing, but still contributed to the Debtor's ongoing income deficit and financial pressure. It's also notable that the U.S. Trustee doesn't point to other

15

expenses (beyond the Boat) that may show a lavish or unnecessarily affluent lifestyle—because no such evidence exists. His expenses for rent, food, clothing, and personal care products are all below the relevant IRS standards. These expenses will believably increase in amounts more than enough to justify adjustments that account for any purported disposable income.

## CONCLUSION

In sum, the consequences of retaining the Boat are equivocal. Based on prior years when the Debtor operated his side business, it may at least cover all expenses from ownership and afford some revenue to meet increased expenses. And Debtor's income may well decrease based on reduced commissions, changes at work, and the current changes by his employer. Other factors, such as a pre-filing calamity or an unreasonable budget or expenses, favor the Debtor. As a result, the U.S. Trustee has failed to sustain its burden of proof of establishing abuse by a preponderance of the evidence.

For these reasons, the U.S. Trustee's Motion to Dismiss is DENIED.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order consistent with this decision will be entered.

Dated: December 20, 2022

BY THE COURT:

_____
Hon. Catherine J. Furay
U.S. Bankruptcy Judge